```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3   UNITED STATES OF AMERICA,      )
                                    )
 4              Plaintiff,          )  CRIMINAL ACTION FILE
           v.                       )  NO. 1:16-CR-00171-ODE-JFK-1
 5                                  )
     DEANNA M. ROBERTS,             )
 6                                  )  APPEAL OF DETENTION ORDER
                Defendant.          )
 7   _____)

 8

 9
     ----------------------------------------------------------
10
            BEFORE THE HONORABLE ORINDA D. EVANS
11               TRANSCRIPT OF PROCEEDINGS
                     OCTOBER 19, 2016
12
     ----------------------------------------------------------
13
     APPEARANCES:
14
     For the Plaintiff:        OFFICE OF THE U.S. ATTORNEY
15                             (By:  WILLIAM L. MCKINNON, JR.)

16   For the Defendant:        FEDERAL DEFENDER PROGRAM, INC.
                               (By:  COLIN M. GARRETT)
17

18
           Proceedings recorded by mechanical stenography
19           and computer-aided transcript produced by

20
                 WYNETTE C. BLATHERS, RMR, CRR
21                    Official Court Reporter
                      2314 U.S. Courthouse
22                   75 Ted Turner Drive, SW
                     Atlanta, Georgia  30303
23                       (404) 215-1547

24

25
```

**INDEX TO EXAMINATIONS**

**WITNESS**                                                                    **PAGE**

GEOFFREY P. SMITH, M.D.

    Direct Examination By Mr. Garrett                              5

**INDEX TO EXHIBITS**

**D E F E N D A N T ' S   E X H I B I T S**

|   |   | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 2 | Letter to the Court | 35 | 35 |

```
 1                    Wednesday Afternoon Session

 2                        October 19, 2016

 3                          2:13 p.m.

 4                          —   —   —

 5                   P R O C E E D I N G S

 6          COURTROOM DEPUTY:  All rise.  United States District

 7  Court for the Northern District of Georgia, Atlanta Division,

 8  is now in session, The Honorable Orinda D. Evans presiding.

 9  Be seated and come to order.

10          THE COURT:  Good afternoon, everybody.  How are you?

11          All right.  Ladies and gentlemen, this is a hearing

12  in an appeal from a detention order.  Apparently, there was a

13  detention hearing in Florida some time ago.  The defendant has

14  now filed a motion to reopen the detention hearing seeking to

15  put in more evidence on the issues involved with the

16  detention.  Does the government oppose the motion?

17          MR. MCKINNON:  Yes, your Honor.  The government does

18  oppose the motion.

19          THE COURT:  You oppose reopening the hearing?

20          MR. MCKINNON:  Not reopening, but the government is

21  opposed to bond.  I'll put it that way.

22          THE COURT:  Okay.  Well, in light of that, I'm

23  inclined to hear the evidence that the defense has, the

24  additional evidence that it wishes to present.  You're saying

25  you're opposed to a bond being allowed?
```

1          MR. MCKINNON:  That's correct.

2          THE COURT:  But this is just a -- what is before me

3   is a motion to reopen the hearing previously held so that the

4   defense can put in more evidence or more argument.  I'm not

5   sure exactly what.  And you're saying you do not oppose that

6   part of it?

7          MR. MCKINNON:  I think the defendant is entitled for

8   the Court to make a de novo determination into whether she

9   should be detained without bond.

10         THE COURT:  Okay.  Well, Mr. Garrett, you may

11  proceed.

12         MR. GARRETT:  Thank you, your Honor.  The first issue

13  I'd like to address, as I outlined briefly in my motion, is

14  the government at the previous detention hearing in Orlando

15  proffered that Ms. Roberts had caused the death of the

16  decedent by injecting her with silicone.  And based on some

17  discussions I've had with the medical examiner here in DeKalb

18  County who did the autopsy of the decedent, I think that's in

19  question.  And so --

20         THE COURT:  I did see that in your motion.

21         MR. GARRETT:  Yes, your Honor.  So he's here today,

22  and I would like to call him.

23         THE COURT:  All right.

24         MR. GARRETT:  Thank you.  Defense calls Dr. Geoffrey

25  Smith.

1       COURTROOM DEPUTY:  Step forward and be sworn, please.

2       MR. GARRETT:  Just getting him from outside.

3       COURTROOM DEPUTY:  Okay.  Step forward and be sworn,

4    please.  Just come right on up.  Raise your right hand.

5                    GEOFFREY P. SMITH, M.D.,

6       herein, having been first duly sworn, was examined

7    and testified as follows:

8       COURTROOM DEPUTY:  Be seated, and state your full

9    name for the record, please.

10       THE WITNESS:  Geoffrey P. Smith.  That's Geoffrey

11   with a G, G-e-o-f-f-r-e-y.

12                    DIRECT EXAMINATION

13   BY MR. GARRETT:

14   Q    Good afternoon, Dr. Smith.

15   A    Good afternoon.

16   Q    Where do you work?

17   A    I work at the DeKalb County Medical Examiner's Office.

18   Q    What is your job there?

19   A    I am a medical examiner, forensic pathologist, and

20   employed as the chief medical examiner.

21   Q    And briefly what's your background and training in the

22   area of pathology?

23   A    I'm a licensed physician in the state of Georgia, and

24   medical training was at the University of Auckland, New

25   Zealand, from 1979 to 1984.  I practiced emergency medicine

1    and family practice for a number of years prior to coming to

2    United States and undertook training in pathology, specialty

3    branch of medicine at Emory University from 1992 to '95.  And

4    in 1995 I did a subspecialty training in forensic pathology at

5    the Fulton County Medical Examiner's Office here in Atlanta,

6    and since that time, obtained my board certification in

7    anatomic and forensic pathology as offered by the American

8    Board of Pathology.  And I've worked for the Fulton County

9    Medical Examiner's Office, State Medical Examiner's Office,

10   the Georgia Bureau of Investigation, and at the DeKalb County

11   Medical Examiner's Office.

12   Q    And so how many years total have you been practicing as a

13   forensic pathologist?

14   A    Since 1995.

15   Q    And in addition to your medical school training and the

16   training you specifically mentioned, do you have ongoing

17   continuing medical education requirements?

18   A    Yes.

19   Q    Can you briefly describe --

20   A    The state of Georgia requires 20 credits in a two-year

21   period, I think, about 20 per year or -- the license is

22   renewable every two years, and I think about 20 per year or 20

23   total.

24   Q    And you've never had any adverse action taken against you

25   or your license by the board or any complaints that would

1   impact your ability to practice in the state?

2   A    No.

3        MR. GARRETT:  Your Honor, at this time I would offer

4   Dr. Smith as an expert in forensic pathology.

5        THE WITNESS:  Any objection?

6        MR. MCKINNON:  No, your Honor.

7        THE COURT:  You may proceed.

8   BY MR. GARRETT:

9   Q    Dr. Smith, did you perform an autopsy on Lateasha Hall in

10  November of last year?

11  A    Yes, I did.

12  Q    And we've spoken a couple of times on the phone about your

13  examination of that particular deceased person; correct?

14  A    Yes.

15  Q    And have you had an opportunity to review your report that

16  you made regarding your examination?

17  A    Yes, I have.

18  Q    Do you have that with you?

19  A    Yes, I do.

20  Q    Okay.  Just so we're on the same page -- may I approach,

21  your Honor?

22        THE COURT:  Yes.

23        MR. GARRETT:  And I have marked as Defendant's

24  Exhibit 1 -- here's a copy for the Court -- Dr. Smith's

25  report.

1          Dr. Smith, is Defense 1 the report you prepared of

2    your autopsy in the case of Ms. Hall?

3          THE WITNESS:  Yes.  It includes the toxicology report

4    as well.

5    BY MR. GARRETT:

6    Q   And you had attached those to your report?

7    A   Yeah, I have a copy in the file.

8    Q   So when you performed the autopsy of Ms. Hall, you took

9    some samples from different parts of her body; is that

10   correct?

11   A   Yes.

12   Q   And where were those taken from?

13   A   All the major organ systems of the body.  If you would

14   like me to tell you each system, I can do that, but basically

15   every organ system and tissues from the buttock region, soft

16   tissue from the buttock region.

17   Q   And the organ samples you took included a tissue sample

18   from the lungs; is that right?

19   A   Yes.

20   Q   And you also took a sample of some liquid that was found

21   in the lungs?

22   A   No, took a sample of liquid from the buttock region.

23   Q   Okay.  And the lungs it was just the tissue sample?

24   A   Yes.

25   Q   And ultimately you opined that the cause of death was a

1  pulmonary embolism caused by liquid silicone; is that correct?

2  A   Well, I listed it specifically as complications of

3  silicone polymer embolization, which is essentially the same

4  thing, and I linked it as -- I didn't specifically say

5  pulmonary embolism because there were numerous organ systems

6  in the body that were involved by the material embolized.   So

7  I think the brunt of the complications probably fell on the

8  lungs, but I can't rule out that the central nervous system,

9  the cardiac system, the liver also contributed to some degree.

10 Q   Do I recall correctly, from when we spoke on the phone,

11 that in those other organ systems you said you didn't notice

12 any signs of inflammation or reaction to the silicone?

13 A   That's correct.

14 Q   But you did see that in the lungs?

15 A   Yes.

16 Q   So were you able to come to that conclusion regarding the

17 cause of death immediately after you concluded your

18 examination of the body?

19 A   No.

20 Q   What else did you have to obtain before you came to the

21 conclusion regarding the cause of death?

22 A   I had to look at the tissue sections and also see what the

23 specialized toxicology examination showed in terms of analysis

24 of the tissue, contents of the tissues, as well as the blood.

25 Toxicology specimens were actually sent to two different

1  laboratories.

2  Q   Let me take those in order.  What was it that you looked

3  for and saw when you examined the tissue samples as you just

4  mentioned?

5  A   What I was looking for and what I saw was evidence in the

6  minute blood vessels of, I guess, the lung particularly but

7  also the others, evidence of distention of these tiny blood

8  vessels by what I assumed was a foreign body of some sort.

9  Q   At that time you didn't know whether it was silicone or

10 not; is that right?

11 A   Not specifically, no.

12 Q   Did you see then that kind of distention that you're

13 talking about in the small blood vessels?

14 A   Yes.

15 Q   Then you also mentioned that you needed to have the

16 results of the toxicological screens.  So the sample you

17 described collecting before, the tissue sample from the lungs

18 and the liquid sample you took from the buttocks, were those

19 sent out for analysis?

20 A   Yes.

21 Q   And to -- who did that analysis?

22 A   U.S. Food and Drug Administration Forensic Chemistry

23 Center in Cincinnati.

24 Q   And then the blood toxicology was done by a state lab; is

25 that right?

1  A    No.   It was done by National Medical Services Labs.

2  They're up in Pennsylvania.

3  Q    And that didn't -- the toxicology screen for the blood

4  didn't return anything that influenced your conclusion about

5  the cause of death I take it?

6  A    No.

7  Q    We'll come back to the FDA report in a moment.  Did you

8  also receive from investigators working on this case a report

9  from a state of Maryland medical examiner regarding another

10 case of death after silicone injection?

11 A    Yes.

12 Q    And in that case that medical examiner had ruled that

13 death a homicide; correct?

14 A    I believe so.  I looked at a couple of -- there was an

15 autopsy report, and I looked at I think it was an article from

16 New York discussing their findings in one of these particular

17 cases.  It was mainly to gather some information about how

18 they went about analyzing the case in terms of cause and

19 manner of death.

20 Q    Why was it relevant in deciding whether to -- in deciding

21 what the cause of death was or how to report it, the

22 conclusions of a medical examiner in an unrelated case in

23 Maryland?

24 A    I think medical examiners -- the actual determination of

25 the cause of death in this instance was not particularly

1  difficult, but the manner of death, which is a part of the

2  death certificate that I had to fill out as the medical

3  examiner, goes to a consideration of the autopsy findings as

4  well as the investigation.  And it's a little more subjective,

5  shall we say.  I think medical examiners would agree that

6  there are a number of instances where they might agree to

7  disagree on the manner of death in any particular case.

8  Q   And does manner of death refer specifically to whether

9  it's ruled a homicide or not?

10  A   Well, there's five manners of death I'm allowed to put on

11  a death certificate, one of five on a death certificate in

12  Georgia, and that's homicide, accident, natural, suicide or

13  undetermined.

14  Q   Did the report from the Maryland medical examiner

15  influence your decision to describe the manner of death in

16  this case as a homicide?

17  A   No.

18  Q   Did you feel that the investigators were trying to

19  influence your decision to rule this a homicide by giving you

20  that report?

21  A   No.

22  Q   Did you see evidence, in examining the body, of injection

23  of, well, what was later found to be liquid silicone?

24  A   I saw evidence of injection, and it was certainly unusual

25  at the time of autopsy to see an abundance of clear somewhat

1  viscous fluids coming out of the soft tissues of the buttock

2  where the injection sites were.

3  Q   And how many injection sites did you observe in the

4  deceased's buttocks?

5  A   There were patches of gauze on the buttock covering

6  small -- what I interpreted as small puncture sites, and there

7  were ten on the left and ten on the right.

8  Q   And the liquid sample that you collected from the buttocks

9  that you described and that was later sent to the FDA lab for

10 analysis, where and how did you specifically collect that?

11 A   First of all, it was -- having made an incision into that

12 tissue as part of the autopsy, the material was flowing fairly

13 freely from the cut surfaces.  So it was fairly easy just to

14 get a test tube full of the material just by going adjacent to

15 the tissue.

16 Q   Did you make that incision specifically at one of the

17 apparent injection sites you saw?

18 A   I don't recall the specific site that I -- they were

19 fairly closely clustered, so I just made an incision where the

20 majority of the injection sites were.

21 Q   Did you see any evidence of silicone anywhere else in

22 Ms. Hall's body besides in the buttocks?  I'm sorry.  Aside

23 from how you described seeing what you suspected was silicone

24 in the lungs, I mean in any of the non-organ issues.

25 A   I'm not quite sure I understand your question.

1  Q    For instance, did she have breast implants?

2  A    No.

3  Q    So if the liquid silicone -- well, let me just establish

4  that.   Later the FDA did, in fact, analyze the liquid from the

5  buttocks and also liquid from -- I'm sorry -- the tissue

6  sample from the lungs and concluded in a report that you

7  attached to yours that both contained silicone; is that

8  correct?

9  A    Yes.

10  Q    Okay.   So if that silicone that you saw and collected from

11  her buttocks was the cause of the complications in the

12  deceased's lungs, then it had to get from her buttocks to her

13  lungs; is that right?

14  A    Yes.

15  Q    Have you done other autopsies in which you concluded that

16  the cause of death was related to injection of liquid

17  silicone?

18  A    Not personally, no.   I'm familiar with two other cases

19  done by a colleague of mine while I was working with him over

20  the past -- one was back in the early nineties, and one was, I

21  think, about ten years later.   I was working out of state.

22  Q    And were you involved in actually doing the autopsies or

23  analysis in those cases?

24  A    No.   I was just one of the staff medical examiners, and

25  since this is a relatively unusual phenomenon, the sort of

1  case that gets discussed at case conferences, you know, there

2  may be interoffice consultation to support or refute the

3  diagnosis depending on what the case is.

4  Q    Have you conducted any research yourself on the movement

5  of liquid silicone in the human body?

6  A    No.

7  Q    Was that a subject that you ever studied in medical

8  school?

9  A    No.

10 Q    Was it a subject in any of the specialized training that

11 you've received since?

12 A    No.  I don't know of any controlled studies in humans

13 using that model, silicone embolism, injection and studying

14 its passage in the body.

15 Q    And have you -- you haven't, I take it, been able to

16 consult any research, any published articles, about the

17 movement of silicone in the human body?

18 A    Well, I think there are papers there that are mainly

19 anecdotal reports rather than like -- as I say, I'm not sure

20 that ethically one could conduct controlled studies of

21 injecting silicone and seeing what happens in adults of --

22 human subjects.

23 Q    And have you studied those anecdotal reports?

24 A    A few of them, yes.

25 Q    And do you remember specifically what those were and what

1  they concluded?

2  A    Well, you'd probably have to be a lot more specific in

3  your question about those conclusions.

4  Q    Okay.  Well, I want to get to understanding better how the

5  silicone traveled from the buttocks to the lungs and before

6  asking your opinion just wanted to know your background and

7  experience, information that you had consulted about that.  So

8  when you say that there are some articles describing

9  anecdotally cases of a similar nature, is that it?  They just

10 describe that there will be cases where people --

11 A    Well, one of the articles I looked at, I think, was in a

12 journal of emergency medicine where individuals, a small

13 number of individuals, had presented to the emergency room

14 with complaints of shortness of breath and respiratory

15 symptoms.  And the common denominator was that they had all

16 received injections of silicone.  And I think the conclusion

17 was that while no actual tissue studies were done, the

18 information provided by the patients and I suppose the x-ray

19 studies, supported the fact that there had been embolization

20 of silicone to the lungs causing the symptoms.  These were in

21 non-fatal cases.

22 Q    And did you consult those articles specifically in

23 connection with preparing your report in this case?

24 A    Yes.

25 Q    So can you quantify in any way how much silicone there was

1   in Ms. Hall's body?

2   A   No.

3   Q   Do you know how much it takes to kill someone?

4   A   No.

5   Q   Are you aware of any studies about that anecdotal or

6   otherwise?

7   A   No.

8   Q   Do you know what factors are relevant to how much silicone

9   might be required to kill someone in this manner?

10  A   I would say the main factor is the access or the -- I

11  don't want to use the word "ability" but the manner in which

12  and the amount of which silicone enters the circulatory

13  system.

14          THE COURT:  Say that again -- circulatory?

15          THE WITNESS:  Yeah, circulatory system.

16  BY MR. GARRETT:

17  Q   Could you elaborate on that?  What is it about the manner

18  that might affect the death results?

19  A   Well, I think, for example, if you can use an example,

20  let's just say for a -- I dare not use the word "human

21  subject" because I just don't think this is being done.  I'm

22  not aware of experiments that have been done.  But let's just

23  say you take an experimental animal and inject silicone into a

24  vein from a syringe containing a known amount of silicone.

25  Obviously, a large amount of silicone will enter the

1   circulation in the same way that an intravenous injection

2   would enter the circulation.  And the majority of it would

3   probably end up in the capillaries of the pulmonary or the

4   lung circulation.

5          And as we -- demonstrable in this instance a certain

6   amount of silicone would pass through the lungs into the left

7   side of the heart and then embolize to other organs in the

8   body.  I don't know how much you'd need to inject in order to

9   be lethal for a particular animal.  Again, I'm not sure if

10  those experiments have been done or not.  But the aim, my

11  understanding, this instance, human subjects or human

12  individuals that wish to have these silicone injections is to

13  not have the silicone get into the vascular system but to stay

14  where -- in the tissues where it is used as an enhancement, I

15  would imagine, of some sort.

16         And, unfortunately, I think given that fat is a body

17  issue, it requires a blood supply to sustain itself like all

18  tissue in the body, so therefore there's a high probability

19  that, first of all, the tiny capillaries that provide blood to

20  and from fat cells will absorb some silicone.  I don't know

21  how much.  And there is also, I guess, a high probability that

22  in the administration of this material into a tissue such as

23  the tissue of the buttock, that a small -- a blood vessel

24  larger than a capillary may be pierced by the needle, and

25  silicone may travel in circulation in that manner.

1          But other than that, I can't give you a quantity of

2     how much silicone would be required to embolize or to be

3     fatal.

4     Q    Let me pick up on one thing you mentioned there.  Did you

5     say that it is possible that some silicone could be absorbed

6     by these small capillaries?  Does that mean that it could --

7     might be able to cross the walls of the capillaries and into

8     the vascular system without there being a break in the

9     capillaries?

10    A    Quite possibly, yes.

11    Q    And I'm assuming, based on what you've said about

12    available research before, that you have no way of knowing

13    what that rate of absorption might be or whether it's

14    significant compared to the amount that might be introduced

15    into the vascular system were there actually a break in the

16    vessel?

17    A    Yes.  That's correct.  I don't have any data.

18    Q    You said that the anecdotal literature described cases

19    where they concluded there was liquid silicone in the

20    pulmonary blood vessels, but it wasn't fatal; is that right?

21    A    I don't know that it was established tissue or a

22    toxicologic diagnosis or it would require an invasive

23    procedure.  I think the paper that I read, the presumption was

24    that given the absence of any other risk factors and the

25    presentation plus the temporal relationship of the

1  administration of silicone, the onset of symptoms that indeed

2  the symptoms were due to, embolization of silicone.

3  Q   So then the research you said you consulted before coming

4  to your conclusions here didn't even determine that, even

5  anecdotally, that silicone caused the symptoms.  They were

6  just assuming that, as you said, based on time?

7  A   Well, clinical findings.  They didn't mention that anybody

8  underwent, in the cases with individuals who survived, any

9  biopsies with tissue diagnosis.

10 Q   Well, assuming that their assumptions were correct and the

11 symptoms were cause by liquid silicone, then it seems to be

12 accepted that there can be a level of liquid silicone

13 circulating in the blood stream that doesn't cause death.  Is

14 that fair?

15 A   Yes, given that the majority of these people actually

16 survived the incident.  So it's -- again, that would go to how

17 much silicone needs to get into the tissues and the vital

18 organs, particularly the lungs, before causing death.

19 Q   Is it also fair to say then that a person could have a low

20 level of liquid silicone floating around in their blood and

21 could be asymptomatic and be unaware of it?

22 A   Quite possibly, yes.

23 Q   You don't have any way of knowing whether before the

24 injections that most recently preceded her death, Ms. Hall

25 might have had silicone at a subclinical or subfatal level in

1  her blood stream already; is that right?

2  A    I don't have any information about that at all, no.

3  Q    And there's no way you could tell that by your exam, is

4  there?

5  A    No.

6  Q    So it's possible that she already had some level, and that

7  entry into the blood stream of silicone from the most recent

8  injections pushed her over that fatal threshold, whatever it

9  is?

10 A    Yes.

11 Q    So I want to now ask you a few questions about the results

12 of those FDA laboratory tests.

13        THE COURT:  Before you go on to that let me ask a

14 question, Dr. Smith.  When you use the term "silicone polymer

15 embolization," define the embolization part of it for me.

16 What do you mean?

17        THE WITNESS:  Sure.  The definition of an embolism is

18 a substance entering the vascular system at one site and then

19 passing to another in the body.  So the most common type of

20 embolism that I deal with as a forensic pathologist is what we

21 call a pulmonary thromboembolism, which is where a thrombus

22 most commonly forms in the legs of an individual, and it

23 breaks off from the vein in which it's formed in the legs and

24 travels up into the heart and into the lungs where it blocks

25 off the circulation.  That's what we call a pulmonary

```
 1    thromboembolism.  There's also fat embolism.  Basically any
 2    foreign material that enters the circulation would qualify as
 3    an embolus or embolism.
 4              THE COURT:  Which is a substance that is out of
 5    place?
 6              THE WITNESS:  Yes.
 7              THE COURT:  And it doesn't -- when I hear the term
 8    "embolus", I think about air being introduced.
 9              THE WITNESS:  Yes.
10              THE COURT:  And that would be an example, but that's
11    not what we're talking about.  When you talk about silicone
12    polymer embolization, it has nothing to do with air being
13    injected into the individual --
14              THE WITNESS:  No.
15              THE COURT:  -- through a faulty injection mechanism,
16    for example?
17              THE WITNESS:  Correct.  You're correct in that there
18    is such a thing as an air embolism.  For example, if you take
19    a syringe just full of air and inject it into a vein, that air
20    would travel in circulation as an air embolus.  In this case
21    it's a silicone polymer embolism.
22              THE COURT:  Okay.  I understand.  Thank you.
23              MR. GARRETT:  Thank you, Judge.
24              So you attached the FDA report to your report;
25    correct?
```

1    THE WITNESS:  Yes.

2  BY MR. GARRETT:

3  Q    And the FDA tested those two samples that you collected,

4  the lung tissue sample and the liquid from the buttocks; is

5  that right?

6  A    Correct.

7  Q    And they subjected each to two different tests; is that

8  right?

9  A    I think the tissue was tested, and the liquid was tested.

10  Q    And the first test they did was a chemical test called a

11  Fourier transform infrared spectroscopy; correct?

12  A    That's what it says here, yes.

13  Q    And you did base your conclusions in part on the

14  information you got back from this report; right?

15  A    Yes.

16  Q    And the results of that FT-IR, as they abbreviated, test

17  were that the samples were consistent with the presence of

18  polydimethylsiloxane; is that right?

19  A    Yes.

20  Q    And that is indeed the most common form of liquid

21  silicone; correct?

22  A    I don't know.

23  Q    Did they say that?  Maybe they didn't.  All right.

24  Siloxane is liquid silicone, though; is that right?

25  A    Yes.

1  Q   Then they also did this second kind of test using a device

2  called the headspace gas chromatograph --

3        THE COURT:  You know, Mr. Garrett, I hate to

4  interrupt you, but this is just sounding a lot like a

5  deposition to me.  I've got the report here before me, and

6  what you're asking the witness to do now, essentially, is to

7  read through it.  I don't really need for him to just read it

8  to me.  I mean, I don't see where you're going with this.

9        MR. GARRETT:  I appreciate that, your Honor, and I'm

10 not trying to --

11        THE COURT:  It sounds like you're fishing, I guess,

12 is what I'm saying.

13        MR. GARRETT:  Okay.  I'm not trying to waste the

14 Court's time.  I just wanted to lay a foundation to be able to

15 then ask the doctor -- basically, the point I'm hoping to make

16 is that there's not -- it wasn't possible to make a chemical

17 match between what was found in the buttocks and what was

18 found in the lungs.  And I was just leading up to that, the

19 foundation.  But your Honor, of course, has discretion to

20 direct my exam.  I don't think it will take too long, though.

21        THE COURT:  Let's just move on to something else.

22 You know, I've got the report here.  You've been over it, I

23 think, the important points.  Let's go on to something else.

24        MR. GARRETT:  Thank you.  Could I just ask about that

25 conclusion, though?

1          THE COURT:  All right.

2   BY MR. GARRETT:

3   Q    Doctor, from either your examination or the reports from

4   the laboratories, were you able to identify the -- well, you

5   put the silicone found in the tissue samples from the lungs as

6   being identical to what was found in the buttocks.

7   A    Well, the report indicates, actually, that they were.

8   There was some -- D4 and D5 were found in the lung tissue, and

9   D4 -- actually, D4, D5, and D6 -- I'm not going to try and

10  pronounce the chemical names, but they're here on the report,

11  D4, D5, and D6 in the dark red fluid and material analyzed

12  from Item 1, and D3, D4, D5, and D6 were identified in the

13  clear fluid from Item 2.

14          MR. GARRETT:  Okay.  I can -- I'd like to follow-up

15  on that, but I don't want to do so without asking your

16  permission.

17          THE COURT:  All right.  Go ahead and follow-up.

18  BY MR. GARRETT:

19  Q    Okay.  Right.  But there's nothing about the chemicals

20  that they concluded were present, the polydimethylsiloxane and

21  other three and four compounds that you mentioned, that is

22  traceable to a specific batch or manufacturer; correct?

23  A    That's probably a question best directed to the

24  toxicologist.

25  Q    Do you believe that you have any evidence that the two

1  substances identical -- that necessarily what you found in the

2  lungs came from the buttocks, a chemical signature that is

3  evidence of that?

4  A    All I have is what's in the toxicology report.

5  Q    Okay.  And do you believe that it states that that is

6  true?

7  A    Well, it's his -- as I will repeat, D4, D5, and D6 were

8  identified in the lungs.  D3, D4, D5, and D6 were identified

9  in fluid from the buttocks.

10 Q    Well, maybe I'm overinterpreting the significance of this.

11 Is it your professional opinion that the silicone you found in

12 Ms. Hall's buttocks was found in the lungs and killed her?

13 A    According to the toxicology report, yes.

14 Q    Well, you're the one who had to ultimately decide whether

15 it was a homicide and what the cause of death was.  So are you

16 stating that it's your opinion that that is the silicone that

17 killed her?

18 A    Oh, I'm not making that determination at all, as to which

19 particular silicone killed her.  All I'm saying is that the

20 silicone that was embolized from the buttocks region caused

21 her death.

22 Q    Okay.  So before you mentioned that there's possible

23 absorption of silicone through capillaries, and another

24 pathway by which liquid silicone could have entered the

25 bloodstream was if there was a broken vessel.  Did I remember

1  that correctly?

2  A    Correct.

3  Q    And you had mentioned direct injection as one possibility.

4  It's also a possibility that a needle injected into the

5  buttocks tissue could break a vessel, and then silicone could

6  enter through that rupture?

7  A    Yes.

8  Q    And is it correct that the vessel would most likely be a

9  vein because the veins suck blood back to the heart, and so

10  they would suck up the silicone?

11  A    That would explain the silicone found in the lungs.

12  Silicone found in the other soft -- the other tissues would

13  also probably have entered via the venous system simply

14  because it would have to go through the heart to get to, for

15  example, the brain, the heart, the liver, the kidney, and the

16  spleen.

17  Q    You mentioned before that fatty tissue has to be sustained

18  by blood flow.  But relative to other kinds of tissues, is it

19  correct that there's not -- there aren't as many blood vessels

20  in the buttocks as there might be in muscles or organs?

21  A    I don't know that there's not -- don't know that that's

22  true.  If you're thinking of large blood vessels, probably

23  not, but in terms of the capillary network, it's probably

24  enormous.

25              THE COURT:  We need to move on.

1  BY MR. GARRETT:

2  Q    You had said on the phone to me that you had -- were going

3  to look to see if you had found evidence in your examination

4  of the tissue samples of the broken blood vessels.  Did you

5  find that?

6  A    I did, yes.

7  Q    What did you find?

8  A    I found a small arterial, but its wall demonstrated

9  rupture and inflammatory response.

10  Q    And was that in the area or one of the areas where you saw

11  the liquid silicone in the buttocks?

12  A    Yes.

13  Q    Were you able to tell if the rupture -- could you tell if

14  that was caused by a needle versus some other cause?

15  A    No.  I don't know what other cause there would be.

16  Q    You saw evidence that Ms. Hall had other silicone

17  injections previously; correct?

18  A    I did or I didn't?  Sorry.

19  Q    Did you?

20  A    I saw ten injection sites on one buttock and ten on the

21  other, and they looked to be approximately the same age.

22  Q    Ms. Hall was biologically male.  She had intact male

23  genitalia; correct?

24  A    I believe so, yes.

25  Q    And her hips and buttocks were -- had been enlarged far

1  beyond what we normally see in a male body; correct?

2  A    I can't give an opinion one way or another.

3  Q    If Ms. Hall had had silicone previously injected into her

4  buttocks, then a broken blood vessel could suck up silicone

5  from those previous injections; correct?

6  A    I can't rule that out, no.  It could.  I mean, there is

7  liquid free in the tissue there.  I guess once a blood vessel

8  is breached in silicone, however long it's been there, it

9  could theoretically be drawn into the circulatory system.

10  Q    And you said before that the goal of people who get

11  injections like this is that it does stays in the region where

12  it's injected, like the buttocks; right?

13  A    I think that's the goal, yes.

14           THE COURT:  I didn't actually ask you this question.

15  I think I know the answer.  But why do people inject

16  themselves with silicone, if you know?

17           THE WITNESS:  I think it's a cosmetic procedure.

18           THE COURT:  Causing that particular area of the body

19  to expand?  Is that the deal?

20           THE WITNESS:  You know, I have not done any reading

21  about that.  I think probably most people are familiar with

22  breast augmentation with silicone implants, but those silicone

23  implants are actually -- the silicone is contained within.

24  And I think it's a misguided procedure in the sense that, you

25  know, silicone is used in cosmetic procedures to enhance areas

1  of the body.  But I think the problem in this instance is that

2  it's a very uncontrolled manner in which silicone is

3  introduced in the body.  So there may be some enhancement

4  there, but there is also a risk of complications simply

5  because this foreign material has been introduced into the

6  tissues.

7  BY MR. GARRETT:

8  Q   From the ruptured blood vessel that you saw evidence of in

9  the tissue samples, could you say how long it would take for

10 enough liquid silicone to enter the blood stream through that

11 rupture to show up as you saw it in the lungs and other

12 organs?

13 A   No.

14 Q   Do you have any opinion about why it took, I believe,

15 approximately 36 to 48 hours after the injections for her to

16 die?

17 A   No.

18 Q   If she had died -- I don't know -- three or four days

19 later instead and you saw the same physical evidence that you

20 observed, would your conclusion about the cause of death be

21 the same?

22 A   Yes.

23 Q   Five days?

24 A   Yes.

25 Q   A week?

1   A    Yes.

2   Q    Is there any upward bound on the amount of time that could

3   pass and if you saw that, you would still say that silicone

4   from her buttocks killed her?

5   A    I guess if the information I received was that the

6   particular individual had silicone injections done, let's just

7   say for argument sake, a month earlier -- that's quite a

8   time -- and they died suddenly and unexpectedly, I don't know

9   how I would rule out the silicone as being a contributing

10  factor in that death.  But I would also have to take into

11  consideration the time interval and try and formulate some

12  sort of medical opinion that made sense as to how the

13  complications occurred such a long time, you know, after the

14  injections occurred.  And I would have to take it on a

15  case-by-case sort of thing, and each individual will have

16  different stories, different investigational findings,

17  different anatomical findings that I would need to take into

18  account.

19          So I guess my answer to your question was that if it

20  occurred -- I mean, I can't even give you sort of a cut-off

21  time as to when, you know, it becomes insignificant.  I think

22  that it's very damaging for the lungs and physiologically

23  damaging to have the large numbers of pulmonary capillaries

24  containing silicone.  But as to the time interval from when

25  the injection occurs to when a fatal incident may occur, I

1  really don't know how long that's going to be.  The cases that

2  I saw in the paper I looked at all occurred in a relatively

3  brief period of time, within days.  So I don't know of any

4  cases where complications have occurred weeks or months later.

5  Q    Something you said about that made me remember when you

6  said earlier that a ruptured blood vessel could suck up

7  already existing liquid silicone.  So -- and is it correct

8  that it's possible that an injury causing a rupture in a blood

9  vessel, even without injection of additional silicone, could

10 result in inflow of silicone into the blood system and the

11 results that you saw, possibly to death?

12 A    Yeah.  I think that's reasonable.  I don't want the Court

13 to think that blood vessels actually suck foreign material

14 into them.  Essentially, there is blood flowing all the time

15 if the heart is beating, and if there is a breach in a blood

16 vessel, then obviously foreign material outside of that blood

17 vessel, if it's in close proximity, will enter the circulation

18 and part of the flow of the blood, you know, to and from the

19 heart.

20        So if there is a traumatic event in the area, for

21 example, if the buttock had silicone and some sort of trauma

22 caused vascular damage, then theoretically silicone could

23 enter the circulation, yes.

24 Q    I'd asked you about whether, you know, a greater passage

25 of time, would it affect your opinion.  If the death had

1   occurred in a shorter period of time, an hour or two after

2   injections of liquid silicone, would that make you more sure

3   that those were the cause of death?

4   A    I think as a forensic pathologist if, you know, there is

5   a -- if I can draw the dots between an event and an outcome

6   occurring in a short period of time, I'd feel more confident

7   rendering my opinion in a general sense.  In this instance I

8   don't think it would alter my confidence level of the opinion

9   that I've rendered.

10          MR. GARRETT:  Thank you.

11          MR. MCKINNON:  I have no questions.

12          THE COURT:  You are excused, sir.  Thank you.

13          THE WITNESS:  Thank you.

14          THE COURT:  Do you have other evidence you want to

15   present?

16          MR. GARRETT:  I do, your Honor.  I have no other

17   witnesses.

18          You know, the magistrate in the Middle District of

19   Florida based his detention order only on risk of flight

20   and -- I'm sorry -- only on danger to the community and not

21   risk of flight, and I don't know how concerned you are about

22   that.  But I did want to address it in case that is something

23   that the Court is also concerned about.

24          Some of this information is already in the record,

25   but Ms. Roberts has lived in the Orlando, Florida area for 20

1  years.  And she, were she granted bond, would go and live with

2  her friend, Olivia Daniels, who is in court today and drove up

3  from Orlando.  Ms. Daniels is a life-long resident of the

4  Orlando area and has lived in the same house, which she's

5  renting, for, I think, three years and is about to renew her

6  lease.  So Ms. Roberts has a stable residence and support.

7          Ms. Daniels also, were the Court to consider a

8  signature bond as a part of conditions of release, Ms. Daniels

9  would be willing to co-sign that.  Ms. Daniels' mother is also

10  a close part of the family, lives a mile away from

11  Ms. Daniels, and she has written a letter to your Honor.  Her

12  name is Ms. Page, and I've marked it as Defense 2.  I would

13  just ask that the Court consider that.

14          THE COURT:  Any objections to Defendant's 2?

15          MR. MCKINNON:  No, your Honor.

16          THE COURT:  Did I admit Defendant's 1?

17          COURTROOM DEPUTY:  No.

18          THE COURT:  Shall I?

19          MR. GARRETT:  If it's in existence, I'll certainly

20  move to admit it, your Honor.  That's fine.

21          THE COURT:  Well, it's up to you.  Do you want to put

22  it in or not?

23          MR. GARRETT:  No.  I think the testimony of Dr. Smith

24  is sufficient.

25          THE COURT:  So you're not offering Defendant's 1.

1    Defendant's 2 is admitted without objection.

2              (Whereupon, Defendant's Exhibit 2 was marked for

3    purposes of identification and admitted into evidence.)

4              MR. GARRETT:  Ms. Roberts also has, although not

5    other family in the immediate area, certainly has support

6    family.  She's close to her uncle and his wife and kids who

7    live in Texas, and she's in regular contact with them.  And

8    all these people will make sure that she has the support she

9    needs to come back for all of her court hearings here.

10             Ms. Roberts, as was outlined in the presentence

11   report that was prepared for Middle District of Florida,

12   has --

13             THE COURT:  Pretrial services?

14             MR. GARRETT:  I'm sorry.  Pretrial services, yes.  Is

15   a freelance writer and also has a business of flipping

16   collectible items on eBay.  Both of things she could continue

17   to do from her home, and both of those would not really be

18   interrupted by her stay in custody here.  So she would also

19   have income.  As I said, though, Ms. Daniels also would

20   support her and make sure she had the means to comply with the

21   Court's order.

22             I also wanted to let the Court know briefly about

23   some significant medical issues that Ms. Roberts has been

24   suffering from while in custody.  And, unfortunately, although

25   I've been continuing to work with the folks at the medical

1    unit at the Robert A. Deyton jail, I just don't think she's

2    getting significant appropriate care, and she could be better

3    cared for by her own physicians out of custody.

4         She's been diagnosed by them with beginning stage

5    kidney disease, and I've seen medical records confirming that.

6    And even though she has been suffering symptoms of that,

7    including a lot of pain and blood in her urine that caused her

8    to have to change pads multiple times a day, all she's had is

9    a preliminary exam.  And she's been waiting to see an outside

10   nephrologist for a couple months now.  And I exchanged emails

11   with Ms. Sayers (phonetic) at the medical unit yesterday, and

12   it's going to be another month before they can even get her to

13   see a nephrologist.

14        Ms. Roberts is also a cancer survivor, I think about

15   seven years ago had a double mastectomy, and she's had some

16   evidence of perhaps recurrence.  She's had cherry angiomas and

17   other issues that indicate that she needs further care by an

18   oncologist.  She's had one appointment a month ago and hasn't

19   received the results of that or any follow up care.

20        She also suffers from a seizure disorder, and she's

21   on medication for that at the jail, has continued to suffer

22   many seizures despite that.  For a period she was

23   unfortunately moved into a housing unit that never had any

24   climate control, and the heat exacerbated and she had a grand

25   mal seizure and chipped a tooth.  I've also seen the records

1    for that.  We eventually got her moved back.  But she's got a

2    lot of serious medical issues, and I just don't think that

3    she's being well cared for there.  I do think that is relevant

4    to consider as well.

5          On the issue that I think is the elephant in the room

6    and that I most highlighted in my memo and wanted to address

7    to the Court about a danger to the community -- first of all,

8    I think there's significant question, as brought up by -- in

9    the testimony of Dr. Smith, about whether these particular

10   silicone injections, assuming for the moment that all that is

11   true, were the cause of death.  It's biologically complicated.

12   I want to proffer, even though Dr. Smith wasn't directly aware

13   of it, that witnesses have stated that they are well aware

14   that Ms. Hall, the deceased, had had numerous prior silicone

15   injections in her buttocks and elsewhere and as a transgender

16   performer was, in fact, kind of famous for this.

17         THE COURT:  I think if you want to proffer that,

18   you'd have to see if the government will accept that proffer.

19         MR. GARRETT:  Okay.  Well, I actually -- that's based

20   on audio provided from witness and alleged victim, Jasmine

21   Turner.  And that audio is provided in discovery, so I don't

22   think the government is going to contest.

23         MR. MCKINNON:  We don't contest that fact, that she

24   had previous injections --

25         THE COURT:  Okay.

1           MR. MCKINNON:  -- of silicone.

2           THE COURT:  That were or were not administered by the

3    defendant?  Or do you know?

4           MR. MCKINNON:  We think primarily they were

5    administered by the defendant on other occasions.  We know

6    that.

7           THE COURT:  See, this is where we -- it gets muddy.

8           MR. GARRETT:  Well, my belief is that she says on the

9    audio that Ms. -- this is Ms. Turner speaking -- that Ms. Hall

10   had received a lot of prior work in injections, some by

11   Ms. Roberts, some by other people at times that we don't

12   really have nailed down.

13          So based on what Dr. Smith told us, I understand the

14   inference, based on being two days prior.  But based on what

15   he said about, you know, the possibility of a blood vessel

16   being broken and other silicone entering the bloodstream and

17   the impossibility of making an exact chemical match between

18   the silicone that was found in her buttocks and that found in

19   her lungs, I don't think the case for that silicone, which is

20   the subject of the charged FDA violations -- we're not dealing

21   with a homicide statute here, so those deal with specifically

22   the silicone that Ms. Roberts was alleged to have transported

23   and injected.  And I don't think that, based on that, that it

24   is -- meets a clear and convincing standard for showing that

25   was the cause of death, that particular injected silicone.

1        That's only one part of that danger to the community

2   analysis, of course.  After that, I think the Court has to

3   address whether any danger can be mitigated by conditions of

4   bond, and I think that's clear.  She's not a person with a

5   criminal record.  She's not a person who is engaging in, you

6   know, pathological assaultive behavior.  She's alleged to have

7   been providing a service making these cosmetic injections, and

8   that's something that she's perfectly capable of not doing

9   even if that were true.  And the Court can impose conditions,

10  including monitoring, as well as rely on the assistance of

11  family and friends, who will be around her, to be confident

12  that she's not going to do anything as crazy as to do that

13  again where the Court could grant her bond.

14        With no criminal history, middle age, I'm surprised

15  really that she was detained in the first place and sorry that

16  it's taken me this long to bring this to the Court's

17  attention.  But I think this is a case that -- you know, in

18  some ways it's analogous to fraud cases where it's voluntary

19  conduct.  It's serious.  It can have an impact if it happened

20  again.  But usually the Courts trust that without a serious

21  criminal history, without a mental health history, without a

22  drug problem, that this is the kind of behavior that someone

23  can be counted on to stop while these proceedings are pending.

24        And so I know that Mr. McKinnon wants to present some

25  evidence in argument, but I'm going to ask for all those

1  reasons that the Court grant reasonable conditions.  Like I

2  said, Ms. Daniels would be happy to co-sign a signature bond,

3  and Ms. Roberts would be able to abide by any conditions.  I

4  would assume that we would ask the probation office in the

5  Middle District of Florida where she resides to supervise her

6  there.  Thank you.

7         THE COURT:  Thank you.  Do you have anything,

8  Mr. McKinnon?

9         MR. MCKINNON:  Yes.  On the issue of a danger to the

10  community, and, specifically, I can outline what the evidence

11  I would present would be.  The Court can either then rely on

12  it as a proffer or I can call Special Agent Owen, case agent,

13  to testify to these facts.  But the government would establish

14  that at least for the past 12 years, since December 2004, the

15  government has not been able to establish any form of

16  legitimate verifiable employment on the behalf of the

17  defendant, except that she's been administering these silicone

18  injections over this extended period of time.

19         We can show that in -- and this would be part of the

20  evidence at trial -- that in December 2004 the defendant

21  sought to obtain silicone, this nonmedical, non -- it's

22  silicone that's not approved by FDA for injection into the

23  human body, that she began to receive it from a company in

24  California.  Before the company in California would provide it

25  to her the defendant had to sign an affidavit in which she

1    declared under oath that her intention with the silicone was

2    not to inject it into the human body.  That's an element of

3    the offense because that's a false statement that she made to

4    the company.

5           And then between December of 2004 and December of

6    2015, the defendant obtained 178 gallons of silicone from this

7    one company.  The government's position would be that it was

8    all for the injection into humans.

9           And we can also show that the defendant was on notice

10   that some of her victims had reactions similar to the victim

11   in this case, the deceased victim in this case, Lateasha Hall.

12   At least three -- at least two of the victims were

13   hospitalized, and the defendant was aware of that, both in

14   2009 and 2010.

15          In 2014 another victim had a reaction to injections

16   in his forehead.  He went to the defendant and explained the

17   reaction that he was having.  The defendant wanted to actually

18   inject him with something else, and that victim said no.  And

19   that victim then reported what the defendant was doing to the

20   Florida Department of Health, and on September the 28th of

21   2015, just less than two months before the defendant injected

22   Lateasha Hall here in the Northern District of Georgia, the

23   defendant was served with a cease and desist order from the

24   Department of Health that she was to stop injecting the

25   silicone into individuals.

1          And in addressing Mr. Garrett's -- in addressing the

2    argument that the defendant could live at home, well, we know

3    that the defendant was administering these injections at her

4    house in Orlando, and she was doing this at home, as well as

5    traveling to the Northern District of Georgia and to other

6    places outside of Orlando to administer the injections.

7          And I know there was an effort made here to kind of

8    call into question whether the injections that Ms. Hall got

9    from the defendant immediately prior to her death are the

10   cause of death, but my belief from listening to Dr. Smith's

11   testimony, is that he stood firm in that the silicone that was

12   injected into her buttocks in these 20 injections is the same

13   silicone that was in the lungs that caused her death.  And the

14   argument that, well, it could have been other injections or

15   silicone from other injections, you know, maybe a jury will

16   have to determine that.  But the evidence is strong and

17   establishes beyond a reasonable doubt that it's the injections

18   that occurred, and then 36 hours later the victim is dead.

19         You know, less than a day after the injections, the

20   victim started complaining to individuals about not feeling

21   well, and I would submit that a jury is just not going to

22   conclude that, oh, they have a reasonable doubt about whether

23   the defendant's injections caused the death simply because

24   there could have been other silicone in her buttocks.

25         And so the government's evidence as to the primary

1    charge here, that the injections caused the defendant -- the

2    victim's death, is strong I would submit, and certainly a jury

3    is likely to find her guilty of the greater offense here that

4    carries the greater penalty, which is up to 30 years

5    incarceration.

6           THE COURT:  Now, that enhanced penalty, is that built

7    into the statute?

8           MR. MCKINNON:  It is.

9           THE COURT:  It specifically says that if somebody

10   dies as a result?

11          MR. MCKINNON:  Serious bodily injury or death, and it

12   enhances the penalty.  So it will be an *Apprendi* factor that

13   the jury ought to make a special finding and have to find

14   beyond a reasonable doubt.  But based on the evidence here and

15   the sequence of events that -- even if she had gotten

16   injections in the past, there's going to be no evidence that

17   she had suffered any kind of complications from any previous

18   injections.

19          She gets these injections.  There are ten injections.

20   The medical examiner found an instance where a vein was

21   pricked by an injection, and the silicone then travels to the

22   lungs, which causes her death.  I would submit that a

23   reasonable jury would find that that's sufficient to establish

24   that the defendant's injections were the cause of death, which

25   will then enhance the penalty.

1          But perhaps the most significant thing about the

2    danger to the community element here for bond purposes is that

3    the government is prepared to show that a friend of the victim

4    called the defendant after the victim died and told her

5    that -- told the defendant that the victim had died.  The

6    victim had additional appointments in the Atlanta area, but

7    rather than keeping those appointments to inject the silicone,

8    she left Georgia and went back to Florida, we believe.  But we

9    know that she didn't keep her additional appoint -- at least

10   one additional appointment in Georgia.  That was in November.

11   November the 16th is the date that victim was injected here in

12   Georgia.

13         In early December of 2015, after the defendant is on

14   notice that Lateasha Hall had died, after the defendant had

15   given her the injections, the defendant ordered and received

16   another gallon of silicone from the supplier in California and

17   that was -- that silicone, gallon of silicone, was sent to

18   her, which means that she was continuing to do the injections

19   even after she knew that the victim in Georgia had died within

20   hours of the defendant injecting her with silicone.

21         So there was really nothing that was going to stop

22   her from continuing -- the fact that a victim died from her

23   injections wouldn't stop her from continuing to administer the

24   injections to other individuals.  Then a condition of bond, I

25   would submit, is certainly not going to do that.

1           And it was only in February of 2016, after Special

2    Agent Owen had identified Factor Two, the company in

3    California that was supplying the defendant with the silicone,

4    the defendant in February of 2016 attempted to order another

5    gallon of the silicone.  By then the company was on notice

6    about the investigation here in the Northern District of

7    Georgia, and the company asked the defendant to submit another

8    affidavit that would say that the defendant was not using the

9    silicone to inject into humans.  And the defendant submitted a

10   false affidavit saying that the intention of her obtaining the

11   silicone was not to inject it into human beings, again,

12   falsely stating the purposes for which she was using the

13   silicone.

14           And then we have evidence from a number of

15   individuals who received silicone injections from the

16   defendant over a period of time that the defendant falsely

17   stated that she was a medical professional, had medical

18   training, and could do the injection safely.  We have no

19   record from the State of Florida that she was a medical

20   professional or had any kind of license that would authorize

21   her to inject a medical device -- the silicone under FDA

22   terminology is considered a medical device -- but that she had

23   any authority or training to safely inject the silicone.  And

24   this wasn't --

25           THE COURT:  Have you provided these materials to --

1          MR. MCKINNON:  Basically I've given Mr. -- defense

2    counsel all of the -- all of the materials that I have he has.

3          THE COURT:  I'm looking specifically -- he said that

4    the defendant placed orders for more of the silicone late in

5    2015 and into 2017.

6          MR. MCKINNON:  He has that information.

7          THE COURT:  You have turned that over.  And what

8    about you also said that the company that sells the silicone

9    required the defendant to execute another affidavit.  And do

10   you have that other affidavit?

11         MR. MCKINNON:  I do, and it's been provided in

12   discovery as well, yes.

13         So those are the government's facts.  I can call

14   Agent Owen to testify to those facts or the Court can accept

15   it as a proffer from me about what we would show to

16   demonstrate that primarily the danger to the community that --

17   my argument would be that if knowledge that the victim died

18   after she administered silicone injections to the victim

19   wouldn't stop her from continuing to administer silicone

20   injections, then any conditions the Court could impose is not

21   going to stop her.

22         MR. GARRETT:  May I respond?

23         THE COURT:  Do you dispute any part of that proffer?

24         MR. GARRETT:  Yes.

25         THE COURT:  Could you be specific.

1          MR. GARRETT:  Yes.  I've seen in discovery no proof

2    of the assertion by Mr. McKinnon that all 178 gallons that

3    they allege that she ordered from the company, I think is in

4    Arizona actually, were used for human injection.  I don't

5    think they have any evidence of that.

6          THE COURT:  Now, is that the last lot that was

7    ordered?

8          MR. GARRETT:  No.  That's the total, I think.

9    They're talking about since 2004.

10         But I have the same issue with the allegation that

11   she was continuing to do injections.  As advertised on the

12   website of the distributor from which she was allegedly

13   ordering this liquid silicone, it's used for all sorts of

14   purposes.  It can be used for rubbing into the skin, into the

15   hair, as a component in various external medications and

16   lotions.  They don't know what she was doing with it except

17   for the relatively small number of people they've talked to

18   who said that they received injections for her.

19         So I don't think there's any back up for that

20   allegation, and I do not accept the proffer that all of those

21   were human injections or that she was doing any --

22         THE COURT:  The only thing I know from the evidence

23   that I've heard is the defendant did use this product to give

24   people injections.  I mean, I don't have any evidence that she

25   was giving massages or, you know, whatever.

1          MR. GARRETT:  True.  Well, I mean, I will proffer --

2   no, no, no.  I understand, but when they say that -- they

3   don't know what she was doing.

4          THE COURT:  No, they didn't say they didn't know

5   what --

6          MR. GARRETT:  That was one purpose.  But they've

7   interviewed lots of people who said previously, prior to

8   Ms. Hall's death, they received injections.  We have some

9   reports of interviewing -- although one of them I just

10  received today.  But I have not seen anything like that for

11  anything that allegedly happened afterwards.  So this

12  inference that she's a danger because she allegedly continued

13  to do this, all they've got is an order for silicone that has

14  a lot of different uses.

15         THE COURT:  Well, a cease and desist order means

16  something.

17         MR. GARRETT:  Right.  That was earlier.

18         THE COURT:  And you've got a copy of the cease and

19  desist order.

20         MR. GARRETT:  I probably do or I've seen reference to

21  it.

22         THE COURT:  And does it specifically pertain to

23  giving injections or is it just to selling silicone?

24         MR. GARRETT:  I'll have to let Mr. McKinnon respond.

25  I don't remember the precise wording of it, your Honor.

1          The last thing that I disputed in Mr. McKinnon's

2   proffer is allegations that she was running some kind of

3   clinic or had specific facilities in her home.  When she was

4   arrested, agents began to do a consent search.  It stopped

5   after a certain period of time because she said she wanted a

6   lawyer, but they went and looked in the rooms.  And even

7   though I've seen allegations from witnesses that only reside

8   in the Atlanta area about this, they didn't find any evidence

9   of that.

10          There's no doctor's office set up.  There are no

11   certificates on her wall.  There's no medical equipment.  So I

12   also dispute that there's any evidence of that that she was

13   doing this in --

14          THE COURT:  Evidence of what?  What are you talk --

15          MR. GARRETT:  That she was doing this in her home.  I

16   took part of the government's danger argument to be that,

17   well, she's going to go home, and then that's where she was

18   doing this anyway.  The only evidence is that she came up here

19   and gave people injections here.  So they didn't find any

20   evidence that she was doing it in her home.

21          Anyway, that residence is gone.  It was leased since

22   she's been in custody.  It's no longer her residence.  She

23   would be living instead with Ms. Daniels at her home

24   residence.  Thank you.

25          THE COURT:  Okay.  So, Mr. McKinnon, your argument is

1  strictly based on danger to the community?

2          MR. MCKINNON:  Well, risk of flight to a lesser

3  extent because of the possible penalty that she's facing of 30

4  years incarceration as a result of a conviction on the greater

5  offense and risk of flight in the sense that, you know, we

6  know that she falsely stated on the affidavit to the company

7  that she was getting the silicone from that she was not going

8  to use it to inject into human beings.  That was a false

9  statement.

10          Even after the evidence that she was -- that there is

11  evidence, substantial evidence, that she was, in fact,

12  injecting silicone into individuals in February of this year,

13  she gave a second false affidavit saying that she would not

14  inject it into human individuals or it wasn't intended for

15  that.  She made false statements to individuals about her

16  medical background, and so because of the false statements I

17  would submit that the defendant is a risk of flight because

18  she's demonstrated to be an untrustworthy person.

19          But the primary argument is danger to the community

20  because she's continued to give these injections even after

21  knowledge that the injections were causing the victims to end

22  up in the hospital, in this case the one victim who was killed

23  by the injections.

24          THE COURT:  Is that it?

25          MR. MCKINNON:  That's it.

1          THE COURT:  I find, based on the evidence that I've

2    heard and the arguments of counsel, that it is not appropriate

3    to allow a bond in this case.  I think, both for reasons of

4    risk of flight and danger to the community, that the defendant

5    should be held without bond until her trial occurs.

6          I agree with the government that she has demonstrated

7    through false statements that she can't be trusted.  I think

8    there -- I can't, of course, at this point know what all of

9    the evidence at the trial is going to show, but it does appear

10   to me that there is existing evidence which likely would show

11   that the defendant administered silicone injections knowing

12   that there was a risk of serious adverse consequences to the

13   people who she injected with silicone and that she continued

14   to do this after she received notice from various sources that

15   it was not legal for her to continue her activities.

16         I think the possibility that the defendant could be

17   convicted of administering the injection that did lead to --

18   that apparently did lead to the death of one of her clients

19   argues in favor of the government's position that there is a

20   risk of flight in this case.  The fact that the maximum

21   sentence of 30 years could be and based on just what I've

22   heard today, it seems there's a good chance that it could

23   be -- that it would be triggered by evidence at trial.  I

24   think that is a good indication of risk of flight.

25         The other thing I'm thinking about is it's my

1    understanding that we're pretty close to a trial date.  Has it

2    been set on the calendar yet?

3          MR. MCKINNON:  I think we got notice today that it's

4    been set for December the 5th.

5          THE COURT:  That's not that long from now.  The

6    hearing in Florida was quite some time ago.  Was it last May?

7    Yeah, May 17th the arrest occurred.  On the same day there was

8    a hearing with Judge Baker in Florida who ordered that

9    Ms. Roberts be detained without bond.  I don't know exactly

10   when this motion was filed.  I see it was filed

11   September 21st.  That's a long lapse of time.

12         I just don't see, frankly, why it is important that

13   the Court take any risk at this point on issues of risk of

14   flight or danger to the community.  We will know the outcome

15   of this case in December.  But I do think, as I said, there is

16   sufficient evidence, indeed more than sufficient evidence, to

17   warrant the Court's determination if there's a risk of flight

18   here and, also, that Ms. Roberts' release on bond would

19   present a danger to the community.

20         So for those reasons while I did grant the motion to

21   reopen the detention hearing, I agree with the result that was

22   initially reached in Florida and deny the motion for bond

23   pending trial.

24         Anything else for today?

25         MR. MCKINNON:  Not for the government, no.

1          MR. GARRETT:  No, your Honor.

2          COURTROOM DEPUTY:  All rise.  Court will stand in

3    recess.

4          (Whereupon, the proceedings were adjourned at 3:30

5    p.m)

6                          -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTERS CERTIFICATE

I, Wynette C. Blathers, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on October 19, 2016, in the matter of UNITED STATES OF AMERICA V. DEANNA M. ROBERTS, Case No. 1:16-CR-00171-ODE-JFK-1; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Pages 1 through 53) is a true and accurate record of the proceedings.

This the 9th day of November, 2016.

_____
/s/ Wynette C. Blathers, RMR, CRR
    Official Court Reporter